**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ALASKA OIL AND GAS ASSOCIATION; AMERICAN PETROLEUM INSTITUTE; STATE OF ALASKA; ARCTIC SLOPE REGIONAL CORPORATION; THE NORTH SLOPE BOROUGH; NANA REGIONAL CORPORATION, INC.; BERING STRAITS NATIVE CORPORATION; CALISTA CORPORATION; TIKIGAQ CORPORATION; OLGOONIK CORPORATION, INC.; UKPEAGVIK INUPIAT CORPORATION; KUUKPIK CORPORATION; KAKTOVIK INUPIAT CORPORATION; THE INUPIAT COMMUNITY OF THE ARCTIC SLOPE, *Plaintiffs-Appellees*, <br><br> v. <br><br> SALLY JEWELL, Secretary of the Interior; DANIEL M. ASHE, Director, U.S. Fish and Wildlife Service; U.S. FISH & WILDLIFE SERVICE, <br><br> *Defendants-Appellants*, | No. 13-35619 <br><br> D.C. Nos. 3:11-cv-00025-RRB 3:11-cv-00036-RRB 3:11-cv-00106-RRB |

and

CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; GREENPEACE, INC.,
        *Intervenor-Defendants*.

ALASKA OIL AND GAS
ASSOCIATION; AMERICAN
PETROLEUM INSTITUTE,
        *Plaintiffs-Appellants*,

and

STATE OF ALASKA; ARCTIC SLOPE
REGIONAL CORPORATION; THE
NORTH SLOPE BOROUGH; NANA
REGIONAL CORPORATION, INC.;
BERING STRAITS NATIVE
CORPORATION; CALISTA
CORPORATION; TIKIGAQ
CORPORATION; OLGOONIK
CORPORATION, INC.; UKPEAGVIK
INUPIAT CORPORATION; KUUKPIK
CORPORATION; KAKTOVIK
INUPIAT CORPORATION; THE
INUPIAT COMMUNITY OF THE
ARCTIC SLOPE,
        *Plaintiffs*,

v.

No. 13-35662

D.C. Nos.
3:11-cv-00025-RRB
3:11-cv-00036-RRB
3:11-cv-00106-RRB

SALLY JEWELL, Secretary of the
Interior; DANIEL M. ASHE,
Director, U.S. Fish and Wildlife
Service; U.S. FISH & WILDLIFE
SERVICE,
                *Defendants-Appellees*,

and

CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; GREENPEACE, INC.,
                *Intervenor-Defendants*.

| | |
|---|---|
| ALASKA OIL AND GAS ASSOCIATION; AMERICAN PETROLEUM INSTITUTE; STATE OF ALASKA; ARCTIC SLOPE REGIONAL CORPORATION; THE NORTH SLOPE BOROUGH; NANA REGIONAL CORPORATION, INC.; BERING STRAITS NATIVE CORPORATION; CALISTA CORPORATION; TIKIGAQ CORPORATION; OLGOONIK CORPORATION, INC.; UKPEAGVIK INUPIAT CORPORATION; KUUKPIK CORPORATION; KAKTOVIK INUPIAT CORPORATION; THE INUPIAT COMMUNITY OF THE ARCTIC SLOPE, *Plaintiffs-Appellees*, | No. 13-35666<br><br>D.C. Nos.<br>3:11-cv-00025-RRB<br>3:11-cv-00036-RRB<br>3:11-cv-00106-RRB |

v.

SALLY JEWELL, Secretary of the
Interior; DANIEL M. ASHE,
Director, U.S. Fish and Wildlife
Service; U.S. FISH & WILDLIFE
SERVICE,
                    *Defendants*,

                and

CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; GREENPEACE, INC.,
          *Intervenor-Defendants-*
                    *Appellants*.

---

STATE OF ALASKA,
               *Plaintiff-Appellant*,

                and

ALASKA OIL AND GAS
ASSOCIATION; AMERICAN
PETROLEUM INSTITUTE; ARCTIC
SLOPE REGIONAL CORPORATION;
THE NORTH SLOPE BOROUGH;
NANA REGIONAL CORPORATION,
INC.; BERING STRAITS NATIVE
CORPORATION; CALISTA
CORPORATION; TIKIGAQ
CORPORATION; OLGOONIK

No. 13-35667

D.C. Nos.
3:11-cv-00025-RRB
3:11-cv-00036-RRB
3:11-cv-00106-RRB

CORPORATION, INC.; UKPEAGVIK
INUPIAT CORPORATION; KUUKPIK
CORPORATION; KAKTOVIK
INUPIAT CORPORATION; THE
INUPIAT COMMUNITY OF THE
ARCTIC SLOPE,
                    *Plaintiffs*,


                v.


SALLY JEWELL, Secretary of the
Interior; DANIEL M. ASHE,
Director, U.S. Fish and Wildlife
Service; U.S. FISH & WILDLIFE
SERVICE,
        *Defendants-Appellees*,


            and


CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; GREENPEACE, INC.,
        *Intervenor-Defendants*.

ARCTIC SLOPE REGIONAL
CORPORATION; THE NORTH SLOPE
BOROUGH; NANA REGIONAL
CORPORATION, INC.; BERING
STRAITS NATIVE CORPORATION;
CALISTA CORPORATION; TIKIGAQ
CORPORATION; OLGOONIK
CORPORATION, INC.; UKPEAGVIK
INUPIAT CORPORATION; KUUKPIK
CORPORATION; KAKTOVIK
INUPIAT CORPORATION; THE
INUPIAT COMMUNITY OF THE
ARCTIC SLOPE,
    *Plaintiffs-Appellants*,

and

ALASKA OIL AND GAS
ASSOCIATION; AMERICAN
PETROLEUM INSTITUTE; STATE OF
ALASKA,
    *Plaintiffs*,

v.

SALLY JEWELL, Secretary of the
Interior; DANIEL M. ASHE,
DIRECTOR, U.S. Fish and Wildlife
Service; U.S. FISH & WILDLIFE
SERVICE,
    *Defendants-Appellees*,

No. 13-35669

D.C. Nos.
3:11-cv-00025-RRB
3:11-cv-00036-RRB
3:11-cv-00106-RRB

OPINION

and

CENTER FOR BIOLOGICAL
DIVERSITY; DEFENDERS OF
WILDLIFE; GREENPEACE, INC.,
          *Intervenor-Defendants.*

Appeal from the United States District Court
for the District of Alaska
Ralph R. Beistline, Chief District Judge, Presiding

Argued and Submitted
August 11, 2015—Anchorage, Alaska

Filed February 29, 2016

Before: Mary M. Schroeder, Johnnie B. Rawlinson, and
Mary H. Murguia, Circuit Judges.

Opinion by Judge Schroeder

## SUMMARY[*]

**Endangered Species Act**

The panel reversed the district court's judgment vacating the United States Fish & Wildlife Service ("FWS") designation of critical habitat in Alaska for the polar bear, a species listed as threatened under the Endangered Species Act; affirmed the district court's denial of cross-appeal claims; and remanded for entry of judgment in favor of FWS.

FWS proposed to designate an area of Alaska's coast and waters as critical habitat for the polar bear: Unit 1, the sea ice habitat; Unit 2, the terrestrial denning; and Unit 3, the barrier island habitat. Oil and gas associations, several Alaska Native corporations and villages, and the State of Alaska ("plaintiffs") challenged the designation under the Endangered Species Act and the Administrative Procedure Act. The district court denied the majority of the claims, but granted summary judgment to plaintiffs on two grounds. FWS and intervenor environmental groups appealed, and plaintiffs cross-appealed.

The panel held that the FWS's designation of polar bear habitat was not arbitrary, capricious or otherwise in contravention of applicable law. The panel held that the district court held the FWS to a standard of specificity that the Endangered Species Act did not require. The panel held that the standard that FWS followed, looking to areas that contained constituent elements required for sustained

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

preservation of polar bears, was in accordance with statutory purpose.

The panel held that FWS's designation of Unit 2 as critical denning habitat was not arbitrary and capricious where Unit 2 contained areas requiring protection for both birthing and acclimation of cubs, and FWS adequately explained its treatment of the relatively few areas of known human habitation. The panel also held that FWS drew rational conclusions from the best available scientific date, as required by the Endangered Species Act, in its designation of both Unit 2 and Unit 3 as critical habitat for the polar bear.

The panel held that FWS provided adequate justification to Alaska pursuant to Endangered Species Act Section 4(i).

Concerning plaintiffs' cross-appeal claims, the panel held that the district court correctly upheld the "no-disturbance zone" around the barrier islands in Unit 3 because it provided refuge from human disturbance. The panel also held that FWS's assessment of the potential economic impacts was not arbitrary and capricious. Finally, the panel held that Section 7 of the Endangered Species Act did not create an additional duty for FWS to consult with states on critical habitat designations.

## COUNSEL

Jeffrey W. Leppo (argued), Ryan P. Steen, Stoel Rives LLP, Seattle, Washington for Plaintiffs-Appellees/Cross-Appellants Alaska Oil and Gas Association and the American Petroleum Institute.

Matthew A. Love (argued), Van Ness Feldman LLP, Seattle, Washington; Tyson C. Kade, Van Ness Feldman LLP, Washington, D.C. for Plaintiff-Appellee/Cross-Appellant North Slope Borough.

Bradley E. Meyen (argued), Senior Assistant Attorney General, Andrew Naylor, Assistant Attorney General, Alaska Department of Law, Anchorage, Alaska; Murray D. Feldman, Holland & Hart LLP, Boise, Idaho; Christina F. Gomez, Holland & Hart LLP, Denver, Colorado for Plaintiff-Appellee/Cross-Appellant State of Alaska.

Kevin M. Cuddy (argued), Stoel Rives LLP, Anchorage, Alaska for Plaintiffs-Appellees/Cross-Appellants Arctic Slope Regional Corporation, NANA Regional Corporation, Bering Straits Native Corporation, Calista Corporation, Tikigaq Corporation, Olgoonik Corporation, Inc., Ukpeagvik Iñupiat Corporation, Kuukpik Corporation, Kaktovik Iñupiat Corporation, and The Iñupiat Community of the Arctic Slope.

Sam Hirsch, Acting Assistant Attorney General, Andrew C. Mergen, Jennifer Scheller Neumann, Clifford E. Stevens, Jr., Meredith L. Flax, David C. Shilton, Robert P. Stockman (argued), Environment & Natural Resources Division, U.S. Department of Justice; Kenneth M. Lord, Of Counsel, Office of the Solicitor, U.S. Department of the Interior, Washington, D.C., for Defendants/Appellants/Cross-Appellees Sally Jewell, Secretary of the Interior, Daniel M. Ashe, Director, U.S. Fish & Wildlife Service, U.S. Fish & Wildlife Service.

Rebecca Noblin, Center for Biological Diversity, Anchorage, Alaska for Intervenor-Defendants/Appellants Center for Biological Diversity, Defenders of Wildlife, Greenpeace, Inc.

## OPINION

SCHROEDER, Circuit Judge:

## INTRODUCTION

This case is about polar bear habitat in Alaska. The polar bear population has been declining for many years, and in 2008, the United States Fish & Wildlife Service ("FWS") listed the species as threatened under the Endangered Species Act ("ESA" or "Act"), 16 U.S.C. §§ 1531 *et seq*. After challenges from all sides, the D.C. Circuit upheld the designation. *In re Polar Bear ESA Listing & Section 4(d) Rule Litig.*, 709 F.3d 1, 2–3 (D.C. Cir. 2013).

Within a year of listing a threatened species, the Act requires FWS to designate habitat critical to the conservation of the species. 16 U.S.C. § 1533(a)(3)(A)(i), (b)(6)(C). In 2009, FWS proposed to designate an area of Alaska's coast and waters as critical habitat for the polar bear. The designation contained three "units." Unit 1, the sea ice habitat, comprised 95.9% of the total designation, while Units 2 and 3, the terrestrial denning and barrier island habitats, made up the final 4.1%. Only the designations of Units 2 and 3 are disputed here.

The proposal drew fire from oil and gas trade associations, several Alaska Native corporations and villages, and the State of Alaska ("Plaintiffs"), all of which seek to utilize the natural resources in Alaska's waters and North Slope that make up much of the designated habitat. After FWS granted final approval to the proposed designation, the objecting parties filed this action challenging the designation under the ESA and the Administrative Procedure Act

("APA"). 5 U.S.C. §§ 706 *et seq*. They principally argued that the habitat designation was unjustifiably large, and also claimed that FWS had failed to follow ESA procedure.

The district court denied the majority of the claims, but granted summary judgment to Plaintiffs on two grounds. *Alaska Oil & Gas Ass'n v. Salazar*, 916 F. Supp. 2d 974 (D. Alaska 2013). Substantively, the district court faulted FWS for failing to identify specifically where and how existing polar bears utilize the relatively small portion of critical habitat designated as Units 2 and 3. *Id.* at 999–1003. Procedurally, the district court faulted FWS for failing to provide the State of Alaska with adequate justification for adopting a final rule not fully consistent with the State's submitted comments. *Id.* at 1003–04. The district court vacated the entire designation. *Id.* at 1004. FWS, joined by several defendant-intervenor environmental groups, appeals, and Plaintiffs cross-appeal.

In its appeal, FWS contends that the district court misconstrued the ESA's requirements by holding FWS to proof that existing polar bears actually use the designated area, rather than to proof that the area is critical to the future recovery and conservation of the species. FWS stresses that it utilized the best available technology as statutorily required. *See* 16 U.S.C. § 1533(b)(2). FWS also contends that there was no meaningful deficiency in the manner in which it provided written justification to the State for its final action. We conclude that these contentions have merit, and reverse the district court's judgment vacating the designation.

Plaintiffs' cross-appeal revives the arguments that the district court rejected. We affirm the district court's denial of these claims. We therefore hold that the designation was not

arbitrary, capricious or otherwise in contravention of applicable law.  *See* 5 U.S.C. § 706(2)(A).  That is the standard we must apply to decisions involving listings under the ESA.  *See In re Polar Bear*, 709 F.3d at 8.

## I.     BACKGROUND

### A.  The Endangered Species Act

The purpose of the ESA is to ensure the recovery of endangered and threatened species, not merely the survival of their existing numbers.  *See* 16 U.S.C. §§ 1531(b), 1532(3) (emphasizing species and habitat conservation, and the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary").  The Supreme Court has recognized that the goal of species recovery is paramount.  The Court said in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978): "The plain intent of Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost."

To accomplish this goal, the Act directs the Secretaries of Interior and Commerce to list endangered and threatened species for federal protection.  16 U.S.C. § 1533(a)(1), (2). The Secretary of Interior must also designate the habitat that is critical to each species's conservation.  *Id.* § 1533(a)(3)(A)(i).  The Secretary of Interior has delegated to FWS the authority to administer the ESA.  50 C.F.R. § 402.01(b).

Critical habitat is defined in the statute as the specific areas "within the geographical area occupied by the species"

that the species needs for recovery and that therefore should be protected. 16 U.S.C. § 1532(5)(A)(i). The statute describes the areas to be protected as those areas containing the physical and biological features (1) essential for the species's success, such as space for growth and normal behavior, food, breeding sites, and habitats protected from disturbance, and (2) which may require special management or protection. *Id.*; 50 C.F.R. § 424.12(b). The Secretary designates critical habitat "on the basis of the best scientific data available" after taking into consideration the probable economic, national security, and other relevant impacts. 16 U.S.C. § 1533(b)(2).

During this process, the Secretary must provide notice of any proposed designation of critical habitat to impacted states and solicit their feedback. *Id.* § 1533(b)(5)(A)(ii). If the approved final designation conflicts with the state's comments, the Secretary must provide the state with written justification for its action. *Id.* § 1533(i). Once an area is designated as critical habitat, federal agencies are required to consult with the Secretary before taking any action that may negatively impact the habitat. *Id.* § 1536(a)(2).

## B. Polar Bear Listing and Critical Habitat Designation

Polar bears (Ursus maritimus) are scattered throughout the ice-covered waters of the Arctic Circle. Two relatively distinct polar bear populations occur within the United States: the southern Beaufort Sea population, which extends into Canada, and the Chukchi-Bering Seas population, which extends into Russia.

The bears spend the majority of their lives on sea ice, which provides a platform for essential life functions such as

hunting, seasonal movements, resting, and mating. Female polar bears, however, particularly on Alaska's northern coast, will come ashore to den and to acclimate their cubs before returning to the sea ice.

Because of global climate change, the extent and quality of Arctic sea ice is declining, and the polar bear population is declining with it. On May 15, 2008, FWS listed the polar bear as a threatened species under the ESA. FWS highlighted concerns over climate change and discussed the major negative impacts that declines in sea ice would have on the species, including nutritional stress caused by diminished numbers of ice-dependent prey, decreased access to the prey that remain, shorter hunting seasons and longer periods of fasting onshore, higher energetic demands for travel and obtaining food, and more negative interactions with humans. *See In re Polar Bear*, 709 F.3d at 4–6. FWS found that such factors would likely result in the decline in the physical condition and reproductive success of polar bears, which would ultimately lead to population level declines. *Id.*

FWS did not designate polar bear critical habitat at the same time it listed the species as threatened, citing the difficulty of determining at that time which areas within the polar bear's extraordinarily large and dynamic range were essential for conservation. Instead, FWS undertook a thorough evaluation of the available science and consulted with polar bear experts. FWS issued a proposed rule on October 29, 2009, designating polar bear critical habitat, and on May 5, 2010, the agency issued a draft analysis of the probable economic impacts of the designation. This was within the one-year period permitted for designation of the areas containing features termed "primary constituent

elements" necessary for a threatened species' conservation. 16 U.S.C. § 1533(b)(6)(A); 50 C.F.R. § 424.12(b).

FWS held two comment periods and multiple public hearings to solicit feedback on the proposed rule and economic analysis. During this time, FWS received over 100,000 comments, ranging from suggestions for dramatically expanding the habitat designation, to assertions that no designation was necessary at all.

On December 7, 2010, FWS published the Final Rule designating critical habitat for the polar bear. The Final Rule designated an area of approximately 187,000 square miles as critical polar bear habitat, broken down into three parts. Unit 1, the sea ice habitat, included the sea ice that polar bears use as a platform for hunting, resting, short- and long-distance movements, and denning. Unit 1 comprised 95.9% of the total area designated as critical habitat, reflecting both the polar bears' large range and the primacy of sea ice to the species' success.

The remaining 4.1% of the critical habitat designation consisted of Unit 2, the terrestrial denning habitat, and Unit 3, the barrier island habitat. FWS, in the Final Rule, described the terrestrial denning habitat as areas with steep, stable slopes, access to the coast, proximity to sea ice, and freedom from human disturbance. It went on to explain that this habitat contains essential physical or biological features, and that the habitat requires protection, given the polar bears' slow reproductive rate and sensitivity to human disturbance during denning. Relying on radio-telemetry data collected on certain denning female bears over several years, FWS defined Unit 2 as covering approximately 95% of known and potential den sites on Alaska's northern coast.

FWS similarly explained that it considered Alaska's coastal barrier islands and their surrounding waters to have the essential physical and biological features for polar bears, because the bears regularly use the islands as places to feed, den, rest, and migrate along the coast without undue human disturbance.  Accordingly, FWS designated the barrier islands, and the spits and waters within one mile of them (the "no-disturbance zone"), as Unit 3.

The ESA requires designation as critical habitat of areas that may require special management or protection.  16 U.S.C. § 1532(5)(A)(i)(II).  FWS found that both Units 2 and 3 may require special management considerations or protection because of the potential negative impacts on the designated areas caused by climate change, oil and gas operations, human disturbance, and commercial shipping.

After identifying the essential physical and biological features of polar bear habitat that may need special management or protection, the Final Rule considered the probable economic and other relevant impacts of designating those areas as critical habitat.  Under the ESA, FWS must use the best scientific data available and take into consideration the economic, national security, and other relevant impacts of designating a particular area as critical habitat before making its final designation.  16 U.S.C. § 1533(b)(2).  FWS may then exclude an area from the final designation if it determines that the benefits of excluding the area outweigh the benefits of including it, unless excluding such area would result in the extinction of the concerned species.  *Id.*

After weighing the costs and benefits of inclusion versus exclusion in accordance with Section 4(b)(2), FWS decided to exclude the Native villages of Barrow and Kaktovik from

the critical habitat designation, along with all man-made structures within the critical habitat, because they did not contain the physical and biological features essential to the polar bear. FWS chose not to exclude any other areas of the original designation on the basis of the probable economic impact, *see id.*, finding that the probable economic impact was negligible.

Following issuance of the Final Rule in December of 2010, three groups filed complaints in district court in 2011 pursuant to the APA, 5 U.S.C. §§ 706 *et seq.*, challenging the Final Rule: (1) the Alaska Oil & Gas Association and the American Petroleum Institute, trade associations representing the Alaska oil and gas industry; (2) the State of Alaska; and (3) a coalition of Alaska Native corporations, an Alaska Native tribal government, and the North Slope Borough, a local native government with jurisdiction over a large swath of territory in northern Alaska. Defendant FWS was joined by three intervenor environmental groups (Center for Biological Diversity, Defenders of Wildlife, Inc., and Greenpeace, Inc.) defending the designation. The district court consolidated the three cases for summary judgment proceedings.

Plaintiffs charged FWS with numerous errors in the critical habitat designation, both substantive and procedural. They argued that the entire designation was substantively improper, contending the designation was unsupported by the administrative record because FWS arbitrarily designated large land and sea ice masses, but did not identify specific areas containing the physical and biological features essential for polar bears. Plaintiffs also claimed several procedural errors in FWS's rulemaking, including a contention that FWS did not adequately consult with the State of Alaska, and that

FWS violated ESA Section 4(i) by failing to give Alaska adequate justification for not incorporating the State's comments into the Final Rule.

The district court rejected all of Plaintiffs' claims except two. The district court found that while the record supported the designation of Unit 1, the largest unit, the sea ice habitat, it did not support the designation of Units 2 and 3. The district court said those designations were unsupported because "[FWS] has not shown, and the record does not contain," evidence that Units 2 and 3 contain all of the required features of terrestrial denning and barrier island habitats. The district court also held that FWS failed to follow the ESA Section 4(i) procedure because the agency provided an inadequate justification for why it did not incorporate all of the State's comments into the Final Rule. The district court vacated and remanded the Final Rule in its entirety, notwithstanding its determination that the designation of Unit 1 was proper. FWS now appeals and Plaintiffs cross-appeal from the district court's summary judgment order.

FWS's principal contention on appeal is that the district court erred in holding that the record contained insufficient evidence of the essential physical or biological features in Units 2 and 3. FWS says it reasonably relied on the best scientific data available in making the designation. *See* 16 U.S.C. § 1533(b)(2). It urges that the ESA does not require more specific information. FWS also contends that it complied with the procedural requirements of ESA Section 4(i) by sending a letter to the State of Alaska, which fully addressed the State's comments on the proposed rule. Finally, FWS contends that even if Plaintiffs' arguments had some merit, the district court erred by vacating the entire

Final Rule despite finding no substantive error with more than 95% of the designation.

In their cross-appeal, Plaintiffs contend that the district court erred by rejecting their other claims.  Plaintiffs principally challenge the holdings that FWS's designation of the "no-disturbance zone" in Unit 3 was reasonable; that FWS sufficiently explained its finding that the essential features of the critical habitat may require special management; that FWS adequately considered the economic impacts of designation under ESA Section 4(b)(2); and that under ESA Section 7(a)(2), FWS had an additional duty to consult with the State of Alaska.

## II.    ANALYSIS

### A. The Purpose of Habitat Designation and the Applicable Standard

We review the district court's grant of summary judgment de novo to determine whether FWS's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).  The Supreme Court has described in general terms how the standard operates:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so

implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This court has been careful to adhere to a narrow application of the standard, while ensuring that the agency's action is considered and rational. We have described the arbitrary and capricious standard as deferential and narrow, establishing a "high threshold" for setting aside agency action. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067, 1070 (9th Cir. 2010). A court must not substitute its judgment for that of the agency, but also must not "rubber-stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1236 (9th Cir. 2001). Instead, the action is presumed valid and is upheld if a reasonable basis exists for the decision. *Nw. Ecosystem All. v. FWS*, 475 F.3d 1136, 1140 (9th Cir. 2007). We have explained that so long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choices made," the court should defer to the agency's expertise and uphold the action. *Id.* (citation omitted). FWS's designation of Units 2 and 3 more than satisfies that standard.

Under the ESA, once it had designated the species as "threatened," FWS had to determine where, within the polar bears' occupied range, the physical or biological features essential to polar bear conservation are found, and it was required to designate these areas as critical habitat. *See* 16 U.S.C. § 1532(5)(A)(i); *id.* § 1533(a)(3)(A)(i). The ESA guidelines explain that these physical and biological elements

essential to the species, known as "primary constituent elements" or PCEs, are at the heart of the critical habitat designation:

> When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

50 C.F.R. § 424.12(b)(5). FWS identified three areas containing PCEs essential to polar bear conservation: sea ice habitat, found in Unit 1; terrestrial denning habitat, found in Unit 2; and barrier island habitat, found in Unit 3.

The district court concluded that, although FWS properly identified the PCEs, it had failed to show specifically where within Units 2 and 3 those PCEs were located, as required by the ESA. FWS argues on appeal that the district court erred because the ESA does not require the level of specificity that the district court insisted upon. In addition, FWS argues it reasonably designated Units 2 and 3 as areas containing PCEs based on the best scientific data available as required by the Act.

At the outset, we agree with FWS that the district court held it to a standard of specificity that the ESA does not require.  The district court asked FWS to identify where each component part of each PCE was located within Units 2 and 3, and to do so, with accurate scientific data, by establishing current use by existing polar bears.  For illustration, with respect to terrestrial denning habitat, the court suggested that FWS could designate only areas containing actual den sites, as opposed to designating areas containing habitat suitable for denning.  No such limitation to existing use appears in the ESA, and such a narrow construction of critical habitat runs directly counter to the Act's conservation purposes.  The Act is concerned with protecting the future of the species, not merely the preservation of existing bears.  And it requires use of the best available technology, not perfection.  *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (explaining that the best scientific data available does not mean the best scientific data possible); *see also Bldg. Indus. Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246–47 (D.C. Cir. 2001) (same).  The D.C. Circuit stressed that while the agency "may not base its listings on speculation or surmise" where there is no superior data, "occasional imperfections do not violate [the ESA]."  *Bldg. Indus. Ass'n of Superior Cal.*, 247 F.3d at 1247 (internal citations omitted).

The ESA thus requires FWS, when designating critical habitat, to focus on the PCEs essential to protecting the polar bear.  *See* 50 C.F.R. § 424.12(b).  By requiring proof of existing polar bear activity, the district court impermissibly shifted the focus of the critical habitat designation away from the PCEs.  *See id.*  Since the point of the ESA is to ensure the species' recovery, it makes little sense to limit its protections to the habitat that the existing, threatened population

currently uses. The district court's construction of the critical habitat requirements thus contravenes the ESA's conservation purposes by excluding habitat necessary to species recovery. The Act contemplates the inclusion of areas that contain PCEs essential for occupation by the polar bear, even if there is no available evidence documenting current activity.

The issue of whether habitat may be designated without proof of a species' activity has been recognized before. In *Alliance for the Wild Rockies v. Lyder*, 728 F. Supp. 2d 1126 (D. Mont. 2010), the court explained that FWS could rationally conclude that areas with evidence of a species' reproduction contain essential PCEs, but could not designate only those areas where there was evidence of reproduction as critical habitat. *Id*. at 1134–35. We agree with the court when it said that "[w]hile it is rational to conclude areas with evidence of reproduction contain the primary constituent elements and should be designated as critical habitat, the Service could not flip that logic so it means critical habitat only exists where there is evidence of reproduction. Such a proposition alleviates the need to further consider the actual physical and biological features of the occupied area." *Id.*

The district court also criticized the designation as an attempt to designate "potential" habitat. We have rejected a similar criticism by pointing out that the agency must look beyond evidence of actual presence to where the species is likely to be found. *See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1165–67. The focus must be on PCEs, not the current existence of a species in an area. The standard FWS followed, looking to areas that contained the constituent elements required for sustained preservation of polar bears, was in accordance with statutory purpose and hence could not have been arbitrary, capricious, or contrary to law.

We therefore turn to FWS's application of that standard to the specific Units that are challenged here.

## B.  Unit 2: The Terrestrial Denning Habitat

The Final Rule identified terrestrial denning habitat as a PCE for the polar bear, and it described topographic features to include coastal bluffs and riverbanks with: (1) steep, stable slopes for the den sites themselves; (2) access between den sites and the coast; (3) sea ice in proximity to the denning habitat prior to the onset of denning season in the fall; and (4) freedom from human disturbance.  FWS harnessed technology to identify possible denning sites.  Using radio-telemetry data collected on female polar bears between 1982 and 2009, FWS identified the areas east of the coastal town of Barrow where 95% of all confirmed and probable polar bear dens had occurred.

Some of the sites were along the coast, some farther inland, and a few as far as 18 miles inland.  To capture most of the sites, FWS designated as critical habitat an area extending 5 to 20 miles inland from the coast east of Barrow, and designated this area as Unit 2.  Two images in the record illustrate the scope of the denning habitat designation.



The left image shows the west area of Unit 2, from Barrow to the Kavik River. The right image shows the east area of Unit 2, from the Kavik River to the Canadian border.

Land west of the town of Barrow was not included within the designation, although it contains some features suitable for den sites. FWS chose not to include it within the designation because studies indicated that polar bears rarely den that far west, likely on account of a lack of access to sea ice in the fall.

The district court nevertheless held that the designation of Unit 2 was arbitrary and capricious. The court faulted FWS for failing to show that the entire Unit 2 area contained all the requisite physical and biological features. In particular, the district court found that the denning studies cited by FWS supported inclusion of the first macrohabitat feature of steep, stable slopes, but also showed that this feature occurred in

only 1% of Unit 2. The court also found that the studies inadequately established the existence of the second (access between dens and the coast) and fourth feature (absence of human disturbance) in Unit 2, and the court strongly questioned whether FWS had sufficiently supported the existence of the third feature (sea ice in proximity of denning habitat to provide access). The court thus demanded scientific evidence of the existence of all of the characteristics of denning habitat in all of Unit 2.

The district court did not make reference to the radio-telemetry data tracking female bear movements. The court also did not appear to take into account the need for denning habitat to include not only the dens themselves, but also undisturbed access to and from the sea ice. The statute calls for the best available scientific data, and this FWS utilized.

On appeal Plaintiffs defend the district court's rejection of the designation of Unit 2, but on somewhat different grounds. Plaintiffs contend that FWS acted arbitrarily and capriciously by mapping Unit 2 using a 5-mile incremental inland measurement, without identifying specifically where, within that area, all four elements of the terrestrial denning habitat PCE were located.

To the extent that Plaintiffs demand greater scientific specificity than available data could provide, Plaintiffs echo the district court's error in demanding too high a standard of scientific proof. Plaintiffs on appeal concentrate more heavily on FWS's choice of a 5-mile increment measurement inland from the coast to define the area of designation, essentially claiming it is arbitrary.

FWS, however, provided a rational explanation for using the mapping methodology that it did. In the Final Rule, FWS explained that it viewed the method developed jointly with the United States Geological Survey (that did the actual mapping), as the best available choice. The method is designed to capture a "robust" estimation of the inland extent of the den use. Polar bears typically den close to the coast, but some have denned as far as 50 miles inland. The 5-mile demarcation provides a straightforward, unbiased method for estimating the inland area in which 95% of the maternal dens are located. In addition, the demarcation accurately represents current polar bear denning concentrations in the zones from Barrow to the Kavik River, and from the Kavik River to the Canadian border, while allowing FWS to account for potential changes likely to occur due to coastal erosion from climate change.

FWS further explained that it rejected restricting designation to an area covering known denning activity in favor of the "robust" 5-mile increment because of several serious data limitations: (1) the uncertainties associated with fine-scale mapping of potential den site areas; (2) the limited size of the denning studies, which involved only 20-40 dens a year, when the total number of females denning in any one year is approximately 240; and (3) the fact that only a portion of the North Slope, which contains ample potential denning habitat, has been mapped. All of the reasons FWS has provided for use of the 5-mile increment are supported by the record.

Plaintiffs on appeal attempt unsuccessfully to poke holes in the analysis. They claim the 5-mile increment does not accurately represent polar bear denning concentrations, pointing out that 95% of dens from Barrow to the Kavik

River occur within 2.8 miles of the coast. This argument, however, ignores the fact that in the eastern zone of Unit 2 (from the Kavik River to the Canadian border) 95% of dens occurred within 18.6 miles of the coast, not 2.8 miles. The area designated as Unit 2 is therefore an appropriate zone for purposes of site inclusion and administrative convenience and is not arbitrary or capricious.

Plaintiffs also assert that future climate change is not an appropriate consideration under the ESA. Plaintiffs contend FWS can only designate habitat that contains essential features at the time the species is listed, not habitat that may become critical in the future because of climate change or other potential factors. Plaintiffs argue there is no record evidence to explain how the proposed critical habitat is currently eroding due to climate change. They also argue that FWS failed sufficiently to connect evidence of climate change to its decision to use a 5-mile increment. Plaintiffs instead suggest FWS relied on mere speculation that climate change would cause land with PCEs to erode in the future.

The record belies these contentions, as the D.C. Circuit has recognized. The very climatic factors that Plaintiffs now criticize are those that the D.C. Circuit took into account in approving the listing of polar bears as threatened. *See In re Polar Bear*, 709 F.3d at 4–6. That court reviewed the bases for listing the polar bear and found that in collecting data on climate change and sea ice, FWS relied on numerous published studies and reports describing the effects of climate change. *See id*. at 6. FWS explained that the rapid retreat of sea ice in the summer and the overall erosion of sea ice throughout the year in the Arctic is "unequivocal and extensively documented in scientific literature." *Id*. FWS further explained that a majority of state-of-the-art climate

models predict sea ice will continue to recede substantially and that the Arctic will be seasonally ice-free by the middle of the 21st century.  *Id*.  FWS also noted that the observational record of current sea ice losses indicates that losses seem to be about 30 years ahead of the modeled values, which suggests a seasonally ice-free Arctic may come a lot sooner than expected.  *Id*.  FWS properly took all of this information into account in designating critical polar bear habitat.

Underlying FWS's rejection of Plaintiffs' challenges is the unassailable fact that bears need room to roam.  Dens are widely dispersed across the North Slope in a non-concentrated manner.  FWS established that polar bears are highly mobile and spend most of their time on sea ice.  In the North Slope of Alaska, polar bears routinely den on the coastal plain, which they reach by walking across the relatively flat topography of that area.  The record also establishes that polar bears are faithful to particular denning areas, but not to particular den sites.  Accordingly, the data supports FWS's position that it is difficult (if not impossible) to predict precisely where they will move within denning habitat in the future.

Additional studies tracked polar bear activity and showed that polar bears move through all of Unit 2.  For example, a study that tracked the activity of three polar bears in different years showed that all three bears moved through large swaths of Unit 2.  The study documented that annually, the active range of a female polar bear is an average of 92,584 square miles.  The habitat designation of a total of approximately 187,000 miles cannot be legitimately characterized as "excessive."

The remaining dispute about Unit 2 concerns areas adjacent to Alaska Native villages, industrial facilities, and other human structures and activities. Plaintiffs argue that FWS failed to provide a reasonable explanation for including areas near some human activity in the designation, while excluding the Native communities of Barrow and Kaktovik from its final critical habitat designation, as well as all man-made structures such as buildings and paved roads. Plaintiffs point particularly to the designation's inclusion of the industrialized area of Deadhorse, which is where the North Slope's principal airport is located. The district court described Deadhorse as rife with structures and human activity.

The record reflects, however, that Deadhorse is primarily an industrial staging area for oil and gas operations, and has no legally defined boundaries and almost no permanent residents. Further, the record shows that polar bears routinely move through Deadhorse, and have been known to den near there. Thus, it was reasonable for FWS to conclude that despite some human activity, polar bears could still move through the Deadhorse area to access and locate den sites free from disturbance. As the Final Rule explained, FWS retained areas around Deadhorse because, among other reasons, "polar bears . . . are allowed to exist in the areas between the widely dispersed network of roads, pipelines, well pads, and buildings."

FWS also sufficiently explained why it did not include areas in and near the communities of Barrow and Kaktovic. FWS carefully distinguished between the towns themselves and other land just outside their boundaries. FWS, for instance, decided not to exclude an additional one-mile radius around Kaktovic from the designation because (1) polar bears

routinely pass through that area; (2) the developed communities make up only a small part of the legally defined boundaries of Kaktovic, so a buffer zone essentially already existed; and (3) the exclusion of the legally defined boundaries already eliminated some potential polar bear denning habitat. Polar bears similarly pass near Barrow. FWS explained that the legal boundaries of Barrow themselves provided a buffer because they are well outside the developed area of the village. Therefore, FWS did not include a "buffer zone" around Barrow and several other native communities west of Barrow; those communities were already outside of the designated area.

Accordingly, FWS's designation of Unit 2 as critical denning habitat was not arbitrary and capricious. Unit 2 contains areas requiring protection for both birthing and acclimation of cubs, and FWS adequately explained its treatment of the relatively few areas of known human habitation.

## C. Unit 3: The Barrier Island Habitat

FWS's Final Rule identified the third PCE for the polar bear as "barrier island habitat," consisting of the barrier islands off the coast and a buffer zone, "used for denning, refuge from human disturbance, and movements along the coast to access maternal den and optimal feeding habitat." The Rule defined the area to include "all barrier islands along the Alaska coast and their associated spits . . . and the water, ice, and terrestrial habitat within 1.6 km (1 mi) of these islands (no-disturbance zone)." Thus the entire barrier island PCE was designated as Unit 3. An image in the record illustrates the scope of the barrier island habitat designation.



In criticizing the designation, the district court failed to take the entirety of the designation into account. As it did with respect to the terrestrial denning habitat of Unit 2, the district court faulted FWS for the lack of evidence in the record showing specifically where on the barrier islands the uses take place, i.e., where bears move to seek den sites, refuge, and feeding habitat. The district court held, in effect, that only such specific areas, which the bears could be shown to utilize at the present time, could be designated as critical habitat.

Given the statutory requirements, FWS appropriately looked to the specific features of the islands that meet the bears' critical needs and to the area in which they occur. The Final Rule defines the barrier island habitat PCE in broad terms to be the barrier islands and associated spits, and the water, ice, and any other terrestrial habitat within 1 mile of the islands. The Final Rule explained the reason for such a

designation is that bears use the barrier islands, associated spits, and surrounding water in ways that are essential to their existence and conservation. The district court erroneously focused on the areas existing polar bears have been shown to utilize rather than the features necessary for future species protection. *See* 50 C.F.R. § 424.12(b)(5) ("When considering the designation of critical habitat, the Secretary shall focus on the [PCEs] within the defined area that are essential to the conservation of the species."); *see also Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1167; *Alliance for Wild Rockies*, 728 F. Supp. 2d at 1134.

We understand that the record contains a confusing use of the key term "denning habitat," and this contributed to the district court's misdirected focus with respect to both Units 2 and 3. For example, in expressing a general dissatisfaction with the Unit 2 designation, the district court found that the record did not support inclusion of more than a tiny fraction of Unit 2 as "denning habitat." The district court was looking at denning studies cited by FWS that indicated that only 1% of Unit 2 is suitable as "denning habitat." Those studies used the term, however, to refer to the habitat suitable for the building of the actual den itself. Because the average den is about 20 feet wide (6.4 m), it is unsurprising that actual den sites themselves would encompass less than 1% of Unit 2. FWS identified the habitat necessary for birthing as well as the post natal care and feeding essential to survival.

In its designation of Units 2 and 3, FWS defined denning habitat more broadly to include not only the denning site itself, but also the area necessary for access to the ice from the den. It considered the denning habitat essential for protection to encompass the areas where polar bears could not only successfully build a den, but also travel, feed, and

acclimate cubs. This was in accord with the statutory purposes, and thus it was not arbitrary or capricious for FWS to include areas necessary for such related denning needs.

The administrative record supports the existence throughout the barrier islands of the features suitable for denning. As the district court conceded, the record shows that many barrier islands provide denning habitat, as historically evidenced by denning polar bears. The record also demonstrates that the islands and the surrounding spits and marine environment provide refuge from human disturbance, and FWS cited evidence showing that polar bears regularly move across the barrier islands in search of denning, food, and rest.

In addition, the Final Rule explains that polar bears use barrier islands as migration corridors, moving between them by swimming or walking on ice or shallow sand bars. There are reports in the record of polar bears denning and feeding on the various barrier islands, and Native Alaskan hunters reporting polar bears regularly moving along coastal islands. The entire barrier island unit thus provides access along the coast to inland maternal den sites and optimal feeding habitat.

In the final analysis, with respect to both Units 2 and 3, Plaintiffs disagree with the scope of FWS's designation of critical habitat, but Plaintiffs cannot point to evidence that FWS failed to consider, or demonstrate that FWS's stated reasons are irrational or unsupported by the record. FWS drew rational conclusions from the best available scientific data, which is what the statute requires. 16 U.S.C. § 1533(b)(2).

**D. FWS Provided Adequate Justification to Alaska Pursuant to Section 4(i)**

FWS is statutorily required to give certain state agencies notice of any proposed regulation to list species or designate critical habitat. *Id.* § 1533(b)(5)(A)(ii). This is to enable the state to provide input. If a state agency files comments disagreeing with all or part of the proposed regulation and FWS then issues a final rule which is in conflict with those comments, FWS must provide the state with an explanation: "[A] written justification for [its] failure to adopt regulations consistent with the [state's] comments or petition." 16 U.S.C. § 1533(i). In this case, FWS gave the required notice and Alaska responded. The issue is whether FWS provided an adequate justification to the State after adopting a final rule that was not consistent with all of the State's comments.

FWS accepted written comments from the public during two different comment periods and held a number of public hearings. FWS contacted appropriate Federal, State, and local agencies; Alaska Native organizations; and other interested parties and invited them to comment on the proposed rule to designate critical habitat for the polar bear in Alaska. During the first comment period, FWS requested comments on the proposed rule. After considering those comments, FWS reopened the public comment period and requested additional comments on the revised proposed rule.

The Alaska Department of Fish and Game ("ADFG") submitted detailed comments. After adopting the Final Rule, FWS responded with a letter to Alaska's Governor Sean Parnell, addressing the State's concerns that were not addressed in the final designation. FWS also cited to those sections of the Final Rule which addressed the State's

comments.  Alaska now contends FWS's written justification was insufficient to comply with Section 4(i) on the grounds that FWS failed to comply with the section's procedural requirements, and failed to consider and provide reasoned responses to several of Alaska's substantive comments.

As a threshold matter, we address whether the written justification called for by Section 4(i) is subject to judicial review.  FWS claims it is not, and our circuit has not yet addressed this question.  But the D.C. Circuit has.  In *In re Polar Bear*, the D.C. Circuit construed Section 4(i) to be a part of the process that is reviewable when the court reviews the final agency action.  709 F.3d at 17–19.  The court explained that it is a review only of whether FWS satisfied the procedural requirements of Section 4(i).  *Id.*  The court said it may not assess the substantive adequacy of the agency's responses to the comments because the ESA does not specify what the substance of a written justification must be.  *Id* at 18–19.  The court analyzed whether FWS was fully aware of and took into account the commenting parties' interests and concerns, because that is what is required by the ESA in requiring a written justification.  *Id*.  We now follow this approach.

The district court found fault with FWS's justification because it incorporated by reference its responses to Alaska's comments contained in the Final Rule rather than including all of those responses verbatim in the letter to the Governor.  The district court held, in effect, that FWS's justification for not adopting a final rule wholly consistent with the Alaska's comments had to be self contained.  Second, the district court found FWS violated Section 4(i) by sending its response letter to the Governor rather than ADFG, which had submitted the comments to FWS.

We disagree with the district court's conclusion that the response was inadequate. There is nothing that we can perceive in the text of Section 4(i), or its purpose, that prevents FWS from referencing other publicly-available documents in support of its justifications. The Supreme Court recently declined to read a similar "one document" requirement into a statute that required government entities to provide reasons for a denial "in writing and supported by substantial evidence contained in a written record." *T-Mobile S., LLC v. City of Roswell*, 135 S. Ct. 808, 811 (2015) (quoting 47 U.S.C. § 332(c)(7)(B)(iii)). In *T-Mobile South*, the telecommunications company had argued that a city must give its reasons for denying permission to build a cell phone tower in a denial letter itself, and not by referencing a separate document. *Id*. at 815–18. In rejecting this approach, the Supreme Court explained that Congress could have written such a rule into the statute if it had wanted, but it chose not to. *Id*. at 818. Like the statute in *T-Mobile South*, the only requirement for the justification in Section 4(i) is that it be in writing. It does not foreclose cross-referencing other publicly available documents. The district court therefore should not have imposed a "one document" requirement.

Nor was it improper for FWS to mail the response to Alaska's Governor instead of ADFG. The comment letters from Alaska and ADFG specified that they "represent[ed] the consolidated comments for the State of Alaska based on input from [ADFG and other departments]." Both letters also noted that Section 4(i) required FWS to provide written justification "to the State." Because the letters appear to be speaking for the State rather than any of the agencies listed, FWS's action was warranted.

Even assuming FWS should have sent its letter to ADFG instead of the Governor, the mistake would have been inconsequential. *See* 5 U.S.C. § 706 (requiring a court reviewing agency decisions to take "due account . . . of the rule of prejudicial error"). It is undisputed that ADFG received the letter. Moreover, Alaska had previously accepted Section 4(i) letters from FWS in exactly this format—a letter sent to the Governor containing responses to ADFG comments and referencing responses in other documents—without issue. *See In re Polar Bear ESA Listing*, 794 F. Supp. 2d 65, 114 (D.D.C. 2011), *aff'd* 709 F.3d 1 (D.C. Cir. 2013).

Finally, we reject Alaska's claim that FWS's letter failed to offer reasoned responses to each of ADFG's substantive comments. FWS's letter highlighted the basis for its positions on the contested issues and therefore, effectively addressed ADFG's comments. *See In re Polar Bear*, 709 F.3d at 19. It is clear FWS responded, in some way, to each of ADFG's substantive comments. Alaska seems to disagree with the substantive content of those responses. Yet Section 4(i) does not guarantee that the State will be satisfied with FWS's response. *See id.* Because Section 4(i) creates a procedural requirement, a court will not analyze the sufficiency of FWS's responses. *Id.* FWS provided written justification showing that it considered ADFG and the State's interests and concerns and, thus, satisfied its duties under Section 4(i). *See id.*

## E.  Plaintiffs' Cross-Appeal

In their cross-appeal, Plaintiffs seek to resurrect the claims that the district court rejected. We deal with them summarily because the district court correctly denied them.

Plaintiffs argue that the "no-disturbance zone" around the barrier islands in Unit 3 does not contain an essential physical or biological feature, and that the evidence does not support the necessity or purpose of including the zone. The district court correctly upheld the no-disturbance zone as a part of Unit 3 because it provides refuge from human disturbance. *See* 50 C.F.R. § 424.12(b)(5) (requirements essential to conservation may include "[h]abitats that are protected from disturbance").

Plaintiffs argue that FWS failed to harmonize inconsistent findings when it determined that the PCEs essential to the polar bear may require special management considerations or protection, while also stating that the designation of critical habitat would not result in changes to polar bear conservation requirements. The latter statement is from FWS's economic impact assessment, and means only that in light of existing regulatory measures, FWS could not foresee any additional expense for affected parties. *See Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1172. In the context of the special management or protection analysis, the existence of alternative protections or programs does not excuse FWS from designating critical habitat. *NRDC v. U.S. Dep't of Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997) (explaining that "the existence of such an alternative would not justify [FWS's] failure to designate critical habitat"). To the contrary, the notion that polar bears are already protected by some regulatory measures in designated areas is an indication that the habitat is critical. *See Ctr. for Biological Diversity v. Norton*, 240 F. Supp. 2d 1090, 1099 (D. Ariz. 2003). There is no conflict.

Moreover, even if the designation of critical habitat would not currently result in changes to polar bear conservation requirements, it is reasonable for FWS to identify special

management considerations or protections that may be required in the future. Nothing in the ESA requires that FWS determine all possible conditions or protections at the time of critical habitat designation. *See* 16 U.S.C. §§ 1532–1533.

Plaintiffs next contend that FWS's assessment of the potential economic impacts was arbitrary and capricious because it grossly underestimated and excluded the indirect costs that would result from designation. Specifically, Plaintiffs maintain that FWS's economic assessment failed to fully account for administrative costs, delay costs, and uncertainty and risk likely to result from critical habitat designation.

The district court found that FWS did consider all such impacts, and we agree. The ESA requires FWS to take into consideration the economic, national security, and other relevant impacts of specifying an area as critical habitat before making its final designation. 16 U.S.C. § 1533(b)(2); 50 C.F.R. § 424.19(b). With this information, FWS determines whether the benefits of excluding particular areas from the designation outweigh the benefits of including those areas in the designation. 16 U.S.C. § 1533(b)(2). FWS is required only to consider the potential economic impacts of critical habitat designation and has discretion to exclude such costs from its final estimate. *Bennett v. Spear*, 520 U.S. 154, 172 (1997).

Here, FWS undertook a formal economic impact assessment of the proposed critical habitat designation as required by Section 4(b)(2). FWS considered potential indirect costs of the designation arising from delay, litigation, uncertainty and risk, and more. FWS chose to address these

impacts qualitatively rather than quantitatively because they were too uncertain to include in the final calculation.

The Final Economic Analysis thus provided a quantitative assessment of the likely direct costs of the designation, as well as a qualitative assessment of the more uncertain and speculative potential indirect costs. FWS's decision not to include those costs deemed too uncertain or speculative in the total potential incremental cost of the designation was within its discretion. FWS's economic impact assessment, therefore, was not arbitrary and capricious.

Alaska lastly argues that Section 7(a)(2) creates an independent duty, beyond the requirements of Section 4, for FWS to engage in consultation with any affected states before designating critical habitat.

Section 7 outlines the process by which federal agencies consult with FWS when those agencies take, fund, or authorize actions that might jeopardize a protected species or harm critical habitat. 16 U.S.C. § 1536. Section 7 provides detailed instruction and procedures for conducting these consultations, including substantive requirements, deadlines, and specific procedures. *See id.* § 1536(a)(2). The district court concluded that Section 7(a)(2) did create a duty to consult, but not one that applied in this case. The district court noted that Section 7 governs the federal interagency consultation process, which applies only after an area has already been designated as critical habitat. It accordingly held that the statute did not require FWS to consult with the State during the initial critical habitat designation, but that it did require consultation with the State when later evaluating whether federal agency action would be likely to destroy or harm the designated habitat.

The district court was correct in denying Alaska's claim, although we do not agree with the district court to the extent that it held that Section 7 creates any independent duty to consult apart from the requirements of Section 4.  In 1982, Congress added the specific procedures for designating critical habitat to Section 4, including FWS's duty to consult with affected states.  Pub. L. No. 97-304, 96 Stat. 1411 (Oct. 13, 1982).  If such a duty already existed under Section 7, Congress would not have had to mandate coordination with the states under Section 4.  Furthermore, Section 4 does not mention any additional duty to consult with affected states or reference Section 7 to imply that additional procedural duties can be found there.  *See* 16 U.S.C. § 1533.

Finally, even if Section 7(a)(2) contained additional processes regarding critical habitat designation, the plain text of the section indicates that consultation with states is discretionary, not mandatory.  *See* 16 U.S.C. § 1536(a)(2).  Congress's use of "as appropriate" language indicates that consultation with states under Section 7(a)(2) is discretionary and not a separately enforceable obligation.  *See, e.g.*, *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166 (9th Cir. 1999) (holding that "as appropriate" language indicates discretionary authority).  We therefore hold that Section 7 does not create an additional duty for FWS to consult with states on critical habitat designations.

## III.    CONCLUSION

The judgment of the district court is **REVERSED** and the case **REMANDED** for entry of judgment in favor of the governmental appellants.