NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 10 2025

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization, | No. 23-3026 |
| Plaintiff - Appellant, | D.C. No. 4:22-cv-00286-JGZ |
| v. | MEMORANDUM* |
| UNITED STATES FISH & WILDLIFE SERVICE; DEBRA HAALAND, in her official capacity as Secretary of the Interior, | |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, Chief District Judge, Presiding

Argued and Submitted November 8, 2024
Phoenix, Arizona

Before: PAEZ and OWENS, Circuit Judges, and SEEBORG, Chief District Judge.**

---

\* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

\*\* The Honorable Richard Seeborg, Chief United States District Judge for the Northern District of California, sitting by designation.

Plaintiff Center for Biological Diversity ("CBD") appeals the district court's order granting summary judgment for Defendants United States Fish and Wildlife Service and Debra Haaland (collectively, "the Service"), in which the district court concluded that the Service acted reasonably in determining that listing the Tucson shovel-nosed snake as an endangered species is not warranted. *See Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*, No. 22-cv-00286, 2023 WL 5432315, at *1 (D. Ariz. Aug. 23, 2023). "We review the district court's grant of summary judgment *de novo* and must determine whether the Service's decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) (quoting 5 U.S.C. § 706(2)). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

The Administrative Procedure Act (APA) governs review of an agency's compliance with the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544 (1994). *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (citing *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901 (9th Cir. 2002)). "Agency action should be affirmed 'so long as the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made.'" *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 979 (9th Cir. 2022) (quoting *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 675

(9th Cir. 2022)). We apply the standards in 50 C.F.R. § 424.14(h)(1) in reviewing the propriety of the service's decision not to list the Tucson shovel-nosed snake subspecies as endangered.

This case concerns the CBD's second attempt to protect the Tucson shovel-nosed snake; it first petitioned the Service to list the subspecies as endangered in 2004. After reviewing that petition, the Service determined that listing the snake as endangered was warranted but that higher priority actions precluded doing so. Although it agreed to add the snake to its candidate species list, the Service highlighted that "uncertainty exists in both the taxonomic entity and subspecies range of [Tucson shovel-nosed snakes]" and called for additional work "to clarify the validity and distribution of the subspecies." 12-Month Finding on a Petition to List the Tucson Shovel-Nosed Snake (*Chionactis occipitalis klauberi*) as Threatened or Endangered with Critical Habitat, 75 Fed. Reg. 16,050, 16,052 (March 31, 2010).

A subsequent study by the United States Geological Service (USGS)—aptly titled "*Fuzzy Boundaries*"—determined that Tucson shovel-nosed snakes and Colorado shovel-nosed snakes were not genetically exclusive; some that lacked the Tucson "look" nevertheless had the related genes, and vice versa. Based on this data, the study suggested taxonomically dividing western shovel-nosed snakes into two species using "previously reported color pattern variation along with the

genetic variation," and dividing one of those species into the Colorado and Tucson subspecies "in keeping with the genetic structure that was recovered across Arizona."

In light of the *Fuzzy Boundaries* study, the Service defined the Tucson shovel-nosed snake's range by genetic data rather than phenotypic indicators, such as color patterns. In its 2014 Species Status Assessment ("SSA"), the Service cited peer-reviewed research that explained how relying on color pattern variation to define subspecies in snakes "often results in confusion when trying to ascribe taxonomic differences to visually distinct, but genetically homogenous, populations." The Service relied on the data from the *Fuzzy Boundaries* report to determine that the snake "occupies a much larger range than previously believed," including areas where it intergrades with the Colorado shovel-nosed snake. Because "development is focused in a small portion of the subspecies' range" once properly understood to include the intergrade zones, the SSA concluded that habitat loss was not likely to imperil the snake's survival. On the basis of this information, the Service concluded that an endangered listing was unwarranted.

In 2020, CBD filed a second petition to list the Tucson shovel-nosed snake as endangered, arguing that the Service mistakenly interpreted the USGS study to expand the snake's range, "wrongly includ[ing] snakes that shared some genetic characteristics with [the Tucson shovel-nosed snake] but do not have the

phenotypic characteristics." Upon reviewing the 2020 petition, the Service determined that listing the Tucson shovel-nosed snake as endangered was still unwarranted.

The district court concluded that the Service acted reasonably, and we agree. CBD argues otherwise, first contending that the Service dismissed its second petition merely because it presented a different interpretation of the *Fuzzy Boundaries* data. This framing is incorrect. The Service dismissed the petition, not due to its distinct interpretation of preexisting data, but because that interpretation did not provide "new information not previously considered." 50 C.F.R. § 424.14(h)(1)(iii). As the district court rightly recognized, the documents underlying CBD's second petition rested on the outdated view that "the consideration of color pattern was necessary in defining subspecies populations" and failed to "address[] the reasoning in the SSA underlying [the Service's] 2014 decision to rely on genetic data" instead. *Ctr. for Biological Diversity*, 2023 WL 5432315, at *7. The petition thus "d[id] not present substantial scientific and commercial information indicating that the petitioned action may be warranted." Endangered and Threatened Wildlife and Plants; 90-Day Findings for Five Species, 86 Fed. Reg. 53,937, 53,941 (Sept. 29, 2021).

Second, CBD contends that the agency failed to explain why those documents or the other bases for its petition—i.e., news about interstate

construction and generic disease—did not amount to substantial scientific or commercial information indicating that listing the snake as endangered may be warranted. The Service's regulations state that "conclusions drawn in the petition without the support of credible scientific or commercial information will not be considered 'substantial information.'" 50 C.F.R. § 424.14(h)(1)(i). Although the Service acknowledged that CBD's information about interstate construction was, technically speaking, new, the agency supported its determination that the construction is not likely to affect significantly the snake's survival as a subspecies with the explanation that the interstate affects only a small segment of the species' range. That analysis, rooted in its prior identification of the snake's much-larger-than-previously-recognized range, is not unreasonable simply because it rejected CBD's preferred alternative. To the contrary, the decision to issue a not-warranted finding in 2020 flowed directly from the 2014 research suggesting that the snake is best distinguished by genetics at the subspecies level, which in turn requires construing its range based on records of genetically, rather than physically, similar snakes. Evidence of CBD's disagreement with that approach does not amount to new, credible scientific information "such that a reasonable person conducting an impartial scientific review would conclude that the action proposed in the petition may be warranted." 50 C.F.R. § 424.14(h)(1)(i).

23-3026

As for the new information about fungal disease, the Service concluded that it represented a "generic potential threat of fungal infections" and was unspecific to Tucson shovel-nosed snakes. Reports that birds get the flu, without more, would not necessarily mean listing the pigeon as endangered may be warranted. For these reasons, the Service's determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

The district court judgment is **AFFIRMED**.